BARRY, Judge.
The defendant was convicted of first degree murder (La.R.S. 14:30) and sentenced to life imprisonment without benefit of parole, plus court costs of $161.50 or thirty days in Parish Prison in lieu of payment.
The defendant raises two assignments of error:
(1) the denial of his motion for a sanity hearing;
(2) the denial of his motion for a continuance which was filed on the morning of trial when it was discovered that several potential jurors read an article in the morning paper that revealed that the defendant had prior convictions.
Betty Bellaci, the wife of Isadore Bellaci, testified that around midnight on May 26, 1991 she and her husband returned home from a Shriner’s banquet in separate cars. Mrs. Bellaci drove into the driveway and her husband drove in behind her car. Mrs. Bel-laci kept her headlights on after she exited the vehicle because she did not leave the porch light on. After they exited the ears, a black man with a gun jumped from the porch of their house. Mrs. Bellaci, who was facing the black man, yelled to her husband that a man with a gun was behind him. Mr. Bellaei turned around and the man demanded money. Mr. Bellaci reached for his back pocket and the thug shot him. Before he fell to the ground, Mr. Bellaci, who carried a gun shot the thug. The thug fired again and the bullet hit the ceiling of the carport. The thug then leaned over Mr. Bellaci’s van and shot Mrs. Bellaci in the chest. Mrs. Bellaci managed to get inside and call the police.
At a physical lineup and at trial, Mrs. Bellaci positively identified the defendant as the man who shot her and murdered her husband. She said that the defendant wore a burgundy-colored shirt on the night of the murder.
Officer Sal Amato and Wayne Holliman, neighbors of the Bellacis, testified that around midnight on May 26, 1991 they heard three gunshots. There was a pause after the first shot, and the second and third shots were fired in rapid succession. Mr. Holliman saw a white Chevrolet Impala with a tan top drive by after he heard the shots. He identified the car, which was owned by the defendant’s mother.
Maria Roberts, the defendant’s girlfriend, testified that the defendant and his brother left her home at 10:00 p.m. on the night of the murder. She said the defendant was wearing a burgundy shirt and both males were in the defendant’s mother’s white Impala with a beige roof. After the defendant and his brother returned to her home at approximately 12:15, Ms. Roberts accompanied them to DeLaRonde Hospital because the defendant had been shot. On the way to the hospital, the defendant removed his burgundy shirt and put on another shirt. Detective Adams testified that he obtained a warrant to search the defendant’s house and seized the burgundy shirt.
Officer Pete Cudardo testified that he retrieved from the scene of the murder a .22 caliber handgun that belonged to Mr. Bellaci. Dr. Steven Harkness removed a bullet from the defendant’s body. The bullet was tested *691 by Kenneth Leary, a Firearms Examiner, and it positively matched the victim’s .22 caliber gun.
Dr. Paul McGarry, an expert in forensic pathology, performed an autopsy and determined that Mr. Bellaci died from a gunshot which entered three inches above the naval.
The defendant contends that it was error to deny his motion for a sanity hearing. Prior to trial, the trial court held a hearing and denied the defendant’s motion for a sanity hearing and motion for toxicology tests. This Court denied writs, stating that it found no error in the court’s ruling. (Writ No. 92-K-1000). The Supreme Court also denied defendant’s writ application. (Writ No. 92-KK-1272).
The parties did not provide to this court a copy of the transcript of the hearing on defendant’s motion for a sanity hearing. The application was considered based on the defendant’s medical records. Because the transcript is now a part of the record the question will now be considered.
At the motion hearing the defendant testified that he heard voices every day for a number of years and was hearing voices as he testified. He said the voices told him to do crazy things and left him confused. He stated that he told several people about the voices but he never received psychiatric treatment until he was in Parish Prison.
Dr. Mark L. Zimmerman, a psychologist called by the defendant, testified that the defendant told him that he had taken Na-vane, an anti-schizophrenic drug. Dr. Zimmerman stated that he could not give an opinion as to defendant’s mental state without further examination and investigation of his records.
Dr. Ciro Juarez-Nunez, a psychiatrist at Orleans Parish Prison, testified that he saw the defendant on March 26, 1992 and determined that he was not mentally ill. Dr. Juarez-Nunez stated that Dr. Arthur Strauss saw the defendant the next day, but Dr. Strauss had no experience with prison inmates. Dr. Juarez-Nunez stated that Dr. Strauss placed the defendant on five milligrams of Navane in response to the claim that he heard voices. The defendant took the medication for at least six days. Dr. Juarez-Nunez stated that he would not have prescribed Navane because the defendant’s behavior did not warrant taking the drug. The doctor said that five milligrams of Na-vane was a minimal dose, “like giving half an aspirin for a headache.”
Dr. Juarez-Nunez placed the defendant with acutely mentally ill patients to observe his reaction. The defendant requested that he be returned to the general prison population, because he no longer heard voices.
Dr. Juarez-Nunez stated that if the defendant did hear voices, “they do not impair his judgment; they do not impair his ability to function, at least in the jail.” Dr. Juarez-Nunez concluded that the defendant was malingering and there was no need for further evaluation.
Dr. Strauss testified that, his initial impression on March 27, 1992 was “no evidence of overt mental illness”. He saw the defendant again on March 30, 1992 and the defendant reiterated that he heard voices. Dr. Strauss, “as a prophylactic or precautionary measure” prescribed five milligrams of Navane in the morning and ten milligrams at bedtime with Benadryl for sleep. Dr. Strauss testified that the defendant was “oriented to time and place and person” and that his behavior did not suggest “gross disorganization or a thought disorder” and the defendant was not delusional.
The trial court denied the motion to appoint a sanity commission, noting that Dr. Juarez-Nunez and Dr. Strauss agreed that the defendant was not in distress. The court concluded that the defendant was malingering, he did understand the proceedings, and was capable to assist in his defense.
A trial judge’s ruling on a request to appoint a lunacy commission will not be disturbed absent a clear showing of abuse of discretion. La.C.Cr.P. art. 643; State v. Henderson, 607 So.2d 725, 727 (La.App. 4th Cir.1992).
Neither expert found the defendant incompetent and Dr. Juarez-Nunez and the trial judge concluded that he was malingering. *692 We have no basis to hold otherwise. This assignment has no merit.
The defendant also contends that it was error to refuse his motion for a continuance. On the morning of trial, several prospective jurors read an article about the case in the morning paper. The story mentioned that the defendant had prior convictions.
State v. Huizar, 414 So.2d 741, 748 (La.1982) sets forth the standard in such a situation:
Where there is a reasonable likelihood that prejudiced news media publicity prior to trial, will prevent a fair trial, the trial judge should continue the case until the threat abates or he should transfer it to another locality not so permeated with publicity.... The defendant, however, must show that he will be specifically prejudiced if the continuance is not granted. (Citations omitted).
Huizar concluded that: “The defense did not convincingly demonstrate that careful voir dire examination of the prospective jurors could not result in a fair and impartial jury_” Id. at 748.
Here, the trial court took defendant’s motion for a continuance under advisement and stated that if voir dire revealed that the prospective jurors had been contaminated, the court would take appropriate action. The transcript of voir dire shows that only five members of the jury pool read that day’s newspaper. All stated they had not discussed the article with any other member of the pool. During voir dire the court dismissed the jurors who had read the story. We are clearly satisfied that the trial judge painstakingly avoided prejudice and did not abuse his discretion by denying the motion for a continuance.
The defendant’s conviction and sentence are affirmed.
AFFIRMED.